UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
MAURICE BLALOCK,                                              :
:
                         Plaintiff,           :       13-CV-8332 (JMF)
:
        -v-                                                        :       OPINION AND ORDER
:
CATHERINE M. JACOBSEN et al.,                           :
:
                         Defendants.        :
:
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/20/2014

JESSE M. FURMAN, United States District Judge:

      Plaintiff Maurice Blalock ("Blalock"), a New York State prisoner proceeding *pro se*, brings this action pursuant to Title 42, United States Code, Section 1983 and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), Title 42, United States Code, Section 2000cc, alleging violations of his constitutional and statutory rights during his incarceration, including infringements on his right to free exercise of Islam. One Defendant, Catherine M. Jacobsen, has filed an Answer. (Docket No. 41; *see* Defs.' Reply Mem. Law Supp. Mot. To Dismiss (Docket No. 40) ("Defs.' Reply Mem.") 1 nn.1-2). All other Defendants who have been served (the "Moving Defendants") now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Complaint. (Docket No. 24).[1] For the reasons stated below, the motion is GRANTED in part and DENIED in part.

---

[1] To date, Plaintiff has not served Defendants Royce, McKaiser, and Stevenson (incorrectly named in the Complaint as Defendant "Anderson," *see* Docket Nos. 15-16). Accordingly, this Court issued an order on October 2, 2014, granting Plaintiff until November 15, 2014 to serve the remaining Defendants or to show good cause for his failure to do so. (Docket No. 49).

## BACKGROUND

Generally, in evaluating a 12(b)(6) motion to dismiss, a court may consider "only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013). Because Blalock is proceeding *pro se*, however, the Court may also consider factual allegations made in his opposition papers, so long as they are consistent with the complaint. *See, e.g.*, *Blue v. Macy's Herald Square*, No. 12-CV-5673 (PAE), 2013 WL 3717777, at *1 n.2 (S.D.N.Y. July 16, 2013). Accordingly, the following facts are taken from the Complaint, exhibits attached thereto, and Blalock's opposition papers (to the extent they are consistent with the Complaint), and are presumed true for the purposes of this motion. *See Karmely v. Wertheimer*, 737 F.3d 197, 199 (2d Cir. 2013).

Blalock, a New York State prisoner, arrived at the Green Haven Correctional Facility ("Green Haven") on February 13, 2009. (Compl. (Docket No. 2) ¶ 31). Since entering state custody in 1997, Blalock regularly had his state-issued green pants altered to be worn above his ankles, in order to comply with a Muslim religious edict that instructs Muslim men that wearing longer pants is an act of "conceit." (*Id*. Ex. 2; *id*. ¶ 42). On September 26, 2011, Jacobsen, then-Acting Deputy Commissioner of Program Services at the New York State Department of Corrections and Community Supervision ("DOCCS"), issued a memorandum ("Directive 3081 Memorandum") to all DOCCS facility superintendents. (*Id*. ¶ 41; *id*. Ex. 1). In it, Jacobsen — who, as noted, does not move to dismiss — stated that some DOCCS facilities had "allowed Muslim and other offenders to alter their state issued green pants in a manner whereby they are cuffed to expose the skin/ankle" and that this practice was "not allowed and will cease immediately." (*Id*. Ex. 1).

On January 25, 2012, DOCCS issued an amendment to Directive 3081, the relevant DOCCS policy regarding inmate clothing, allowing Muslim male inmates to wear their state-issued pants at the top of the ankle bone. (*Id*. Ex. 4). Blalock then began to wear his pants at the length mandated by Islamic law, but was forced by Defendant Corrections Officer Jeffrey Erns to change back into unaltered pants twice, once before Erns had seen the amended directive (*id*. ¶ 62), and once on February 13, 2012, a few weeks after Erns had read the amended directive in Blalock's presence (*id*. ¶¶ 63, 67). During that period, Blalock filed two grievances, one directed at the Directive 3081 Memorandum itself and another at verbal harassment he had allegedly experienced from Erns and Defendant Corrections Officer James Goehl (incorrectly named in the Complaint as "Gayle"). (*Id*. Exs. 3, 6).

On May 30, 2012, Blalock was selected at random to submit to a urinalysis. (*Id*. ¶ 82). The urinalysis results were positive for marijuana, despite the fact that Blalock, a former crack cocaine user, had been sober since 1997. (*Id*. ¶ 87; *id*. Ex. 11). As a result, Blalock was charged with violating Green Haven's drug use policy and was granted a disciplinary hearing. (*Id*. ¶ 87; *id*. Ex. 11). While awaiting that hearing, Blalock submitted two requests to attend religious services. (*Id*. ¶ 89). One, sent to Defendant Deputy Superintendent Edward Burnett, never received a response; the other was denied by an unknown officer. (*Id*. ¶ 89). Prior to the disciplinary hearing, Blalock also consulted with his assigned hearing assistant Stevenson (who, as noted in *supra* note 1, has not yet been served), who in turn consulted with Defendant Corrections Officer Nicole Huttle, who worked in the hearing office. (*Id*. ¶¶ 90, 94, 97). Huttle told Stevenson that Blalock would not be allowed access to several pieces of documentation that he had requested for the hearing, including all documentation from Fishkill Correctional Facility, the site at which Blalock's specimen was tested. (*Id*. ¶ 97; *id*. Ex. 13).

Blalock's disciplinary hearing, for which Royce served as the hearing officer, took place on June 25, 2012. At the conclusion of the hearing, Royce found Blalock guilty of violating the facility's drug use policy, and sentenced him to twenty-four days of prehearing keeplock confinement; sixty-six days of special housing unit ("SHU") confinement; and ninety days' loss of phone, commissary, and packages privileges. (*Id*. ¶ 100; *id*. Ex. 17 at 26). On July 5, 2012, Blalock was transferred to Clinton Correctional Facility ("Clinton") to serve the remainder of his SHU sentence.

## PROCEDURAL HISTORY

Blalock commenced this action on November 20, 2013, naming defendants from Green Haven and defendants from Clinton. On December 30, 2013, the Court issued an Order asking Blalock to show cause why his claims against the Clinton Defendants should not be severed from this action under Rule 21 of the Federal Rules of Civil Procedure and transferred to the Northern District of New York pursuant to Title 28, United States Code, Section 1404(a). (Docket No. 8). After receiving Blalock's response (Docket No. 9), the Court severed Blalock's claims arising out of events that occurred at Clinton and transferred those claims to the Northern District of New York (Docket No. 12), where they are now pending.

On March 18, 2014, all but one of the Defendants who had been served — namely, Albert Prack, Superintendent William A. Lee, Burnett, Lieutenant Orazio Bucolo, Sergeant Kevin O'Connor, Huttle, Erns, Goehl, and Michael Mills — filed this motion to dismiss the Complaint pursuant to Rule 12(b)(6). (Docket No. 24). On May 6, 2014, Jacobsen filed a separate Answer to the Complaint (Docket No. 41), and the Moving Defendants filed a reply memorandum of law indicating that one additional Defendant, Corrections Officer Natasha Trembath, had been served and joined in the motion seeking dismissal. (Defs.' Reply Mem. 1

n.1). As Blalock indicates that he has abandoned his claims against Mills and Bucolo (Pl.'s Mem. Opp'n Defs.' Mot. To Dismiss (Docket No. 34) ("Pl's Mem.") 25, 34), the Court will therefore evaluate the motion to dismiss as it relates to the remaining Moving Defendants.

## LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to 12(b)(6), the Court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008). A claim will survive a 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant acted unlawfully," *id.*, and cannot rely on mere "labels or conclusions" to support a claim. *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id*. at 570.

Because Blalock is proceeding *pro se*, his Complaint "must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Nonetheless, a *pro se* litigant must still state a plausible claim for relief. *See, e.g.*, *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). Thus, the Court's "'duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it.'" *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (quoting 2 Moore's Federal Practice § 12.34[1][b], at 12–61 (internal quotation marks omitted)).

**DISCUSSION**

**A. Claims Brought Under RLUIPA**

As an initial matter, Blalock's RLUIPA claims must be dismissed. As Defendants correctly note, many courts in this Circuit have held that RLUIPA does not allow for money damages against public officials in their individual capacities. *See, e.g.*, *Prescott v. Annetts*, No. 09-CV-4435 (CM), 2010 WL 3020023, at *7 (S.D.N.Y. July 22, 2010); *Pugh v. Goord*, 571 F. Supp. 2d 477, 507 (S.D.N.Y. 2008); *Celestin v. Fischer*, No. 12-CV-1612 (GTS) (ATB), 2013 WL 5406629, at *9 (N.D.N.Y. Sept. 25, 2013). Additionally, in this Circuit, "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006); *see also Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996). As all of the Moving Defendants are employed at Green Haven, and Blalock is presently incarcerated at Eastern Correctional Facility (Docket No. 18), any claims for injunctive relief against the Moving Defendants are moot.[2] Accordingly, Blalock's claims under RLUIPA — whether for money damages or injunctive relief — are hereby dismissed, and only Blalock's claims for money damages under Section 1983 survive.

---

[2] Blalock argues that his RLUIPA claims for injunctive relief are not moot because Commissioner Jacobsen's policy "continued to burden and adversely inhibit Blalock's [First Amendment rights] well beyond his time at [Green Haven]," and that the policy, even as amended, continues to "create an issue of contention" for Blalock. (Pl.'s Mem. Opp'n Defs.' Mot. Dismiss 10). There is some precedent in the Southern District for allowing claims for injunctive relief against prison officials to proceed despite an inmate's transfer from the facility in question, under the theory that such claims may be "capable of repetition, yet evading review." *Pugh*, 571 F. Supp. 2d at 489. Even reading Blalock's Complaint broadly, however, the only injunctive relief he requests under RLUIPA relating to this ongoing harm is against the author of the policy herself — Defendant Jacobsen — who is not a subject of this motion to dismiss. (*See* Compl. ¶ 210 (requesting that Jacobsen "be ordered to rescind the discriminative policy that she initiated restricting the height of the Orthodox Muslim's pant hem to the top of his ankle bone"); Pl.'s Mem. 11 (requesting that the Court "compel[] the NYSDOCCS to rescind" Amended Directive 3081)). The Court need not address the exception to the mootness doctrine as it pertains to the Moving Defendants.

### B. Religiously Motivated Verbal Harassment

Next, Blalock alleges that his constitutional rights were violated when Erns — and, to a lesser extent, Goehl — repeatedly "harass[ed] and profile[d]" him because of his faith. (Compl. ¶¶ 36-37, 61). Blalock also avers that O'Connor conducted an inadequate investigation into the harassment and then lied to his superiors about it, and hence should also be held accountable for this constitutional violation. (*Id.* ¶¶ 74, 78). It is well settled in this Circuit, however, that "verbal harassment, standing alone, does not amount to a constitutional deprivation." *Cole v. Fischer*, 379 F. App'x 40, 43 (2d Cir. 2010) (summary order) (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam)); *see also Baskerville v. Goord*, No. 97-CV-6413 (BSJ), 2000 WL 897153, at *3 (S.D.N.Y. July 6, 2000) ("Mere verbal abuse or the use of . . . slurs or epithets reflecting . . . prejudice, although reprehensible, does not form the basis of a claim pursuant to § 1983."). That principle holds true even when the harassment concerns a plaintiff's religion. *See, e.g.*, *Hamilton v. Erhardt*, No. 10-CV-6234 (CJS), 2011 WL 3476475, at *4 (W.D.N.Y. Aug. 9, 2011) (holding that verbal taunting does not amount to a constitutional violation "even where such verbal harassment pertains to the plaintiff's race or religion."). It also holds true irrespective of the frequency of the harassment, as "[a] violation of a prisoner's federal rights under § 1983 requires an injury that involves more than mental or emotional pain." *Islam v. Goord*, No. 05-CV-7502 (RJH), 2006 WL 2819651, at *4 (S.D.N.Y. Sept. 29, 2006). In this case, Blalock does not allege anything more severe than verbal taunts and discrimination, or that he suffered any physical harm as a result of the harassment. As a result, Blalock's claims based on the alleged religiously motivated verbal harassment must be dismissed.

7

**C. Due Process**

Blalock next alleges that his due process rights were violated when he was sentenced to sixty-six days of SHU confinement and twenty-four days of pre-hearing keeplock after an allegedly unfair disciplinary hearing — a hearing that was one-sided, in relevant part, because Huttle denied him access to several pieces of documentation to aid in his defense. (Compl. ¶¶ 97, 100; *id*. Ex. 17 at 26). In raising a due process claim, a plaintiff must first establish that the challenged action infringed a constitutionally protected property or liberty interest. *See, e.g.*, *Perry v. McDonald*, 280 F.3d 159, 173 (2d Cir. 2001). A prison disciplinary proceeding implicates such an interest only if it "imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Sandin v. Connor*, 515 U.S. 472, 484 (1995)). In considering whether segregated confinement qualifies as an "atypical and significant hardship," courts look to "the extent to which the conditions of segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (quoting *Palmer*, 364 F.3d at 64).

The Second Circuit has set forth general guidelines in assessing whether a period of segregated confinement implicates due process rights, and has held that segregated confinement of less than 101 days does not generally give rise to a protected liberty interest. *See, e.g.*, *Sealey v. Giltner*, 197 F.3d 578, 589 (2d. Cir. 1999). Nevertheless, the Court has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," *Palmer*, 364 F.3d at 64 (citing *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000)), and has held that confinement for fewer than 101 days may create a liberty interest if "the conditions were more severe than the normal

SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical," *id.* at 65.  Additionally, the Court has cautioned that, absent a detailed factual record, dismissal of due process claims may be appropriate only "where the period of time spent in SHU [is] exceedingly short — less than the 30 days that the *Sandin* plaintiff spent in SHU — and there [is] no indication that the plaintiff endured unusual SHU conditions."  *Id*. at 65-66.

Applying those standards here, Blalock's due process claims are sufficient to survive Defendants' motion to dismiss.  First, insofar as Blalock's confinement in prehearing keeplock and the SHU comprised a "sustained period of confinement," with both sentences arising out of the June 1, 2012 positive drug test, the relevant period of confinement for assessing Blalock's due process rights is arguably ninety days — a period that approaches the 101-day threshold for more detailed factual development set forth by the Second Circuit.  *Cf. Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001) (aggregating periods of administrative confinement when the plaintiff's second administrative confinement "was simply a continuation of" the plaintiff's first confinement).[3]  Even if the relevant period of confinement were sixty-six days, however, the Court could not conclude as a matter of law that Blalock's time in confinement was insufficient to implicate due process rights, as Blalock alleges that the conditions he suffered in segregated

---

[3]     In *Giano*, the Court deemed aggregation of the plaintiff's two periods of confinement "particularly appropriate" because the two periods of confinement were based on the same administrative rationale and the conditions during both periods of confinement were "for all practical purposes, identical."  238 F.3d at 226.  Here, Blalock does not describe the conditions he faced in administrative keeplock — only those he faced in the SHU — and, as such, the Court cannot definitively rule on whether aggregation of the two periods of confinement is appropriate.  Nevertheless, such a ruling is unnecessary, as the Court cannot conclude as a matter of law that Blalock's sixty-six-day sentence in the SHU is by itself insufficient to implicate due process rights.  *See, e.g.*, *Hollman v. Lindsay*, No. 08-CV-1417 (NGG), 2009 WL 3112076, at *12 n. 7 (E.D.N.Y. Sept. 25, 2009) (declining to rule on aggregation because the Court could not conclude that the conditions of one period of confinement "by themselves do not constitute an atypical and significant hardship as a matter of law").

9

housing were far below the conditions experienced in general confinement. On his first day in segregated housing at Clinton — where Blalock was sent after a disciplinary transfer (Compl. ¶ 106) — Blalock was placed in a cell with a leaking and defecation-smeared toilet, roach-filled locker, and trash-covered bed frame. (*Id.* ¶ 107). And although Blalock was transferred the next day to a cell that was "a little better" (*id.*), Blalock continued to experience conditions that, in the absence of a more detailed factual record, could plausibly be considered "more onerous than usual." *Davis*, 576 F.3d at 133. (*See, e.g.*, *id.* ¶ 111 (alleging that the only operable shower stall was "blackened with mold"); *id.* ¶ 117 (claiming that Blalock was deprived of his personal property for a period of time)).[4]

Given that similar SHU conditions, for periods shorter than 101 days, have been deemed sufficient to survive dismissal, the Court concludes that Blalock has pleaded facts sufficient to implicate a constitutionally protected liberty interest. *See, e.g.*, *Welch v. Bartlett*, 196 F.3d 389, 393-94 (2d Cir. 1999) (ninety days in SHU confinement with substandard hygienic conditions created issue of fact as to liberty interest); *Palmer*, 364 F.3d at 66 (seventy-seven days in SHU confinement with no access to personal items and denial of privileges deemed sufficient to survive motion for summary judgment). As that is the only basis upon which Defendants argued in their initial memorandum of law that dismissal was warranted, Blalock's due process claim survives the motion to dismiss. The Court declines to consider Defendants' argument, made for

---

[4] In their reply memorandum of law, Defendants contend that Blalock's due process claim should be dismissed because any substandard conditions Blalock suffered in the SHU "[are] the responsibility of the staff at Clinton C.F., and not that of any defendant in this case." (Defs.' Reply Mem. 8). That argument misses the point, as the gravamen of Blalock's claim is not that his rights were violated by the conditions of his confinement at Clinton, but rather that his rights were violated by the hearing at Green Haven. Blalock's punishment is relevant to the claim, regardless of where he served it, because he has to demonstrate a protected liberty interest. *See, e.g.*, *Palmer*, 364 F.3d at 62, 68 (affirming the denial of a summary judgment motion brought by prison officials in a due process claim when the plaintiff served his SHU sentence at other prison).

the first time in their reply memorandum of law (Defs.' Reply Mem. 9), that Blalock was afforded all the process to which he was entitled, as "rais[ing] entirely new issues on reply . . . deprives the non-moving party of the opportunity to respond." *Nwankwo v. Williams*, No. 07-CV-364 (CBA), 2008 WL 4190640, at *3 (E.D.N.Y. Sept. 10, 2008).

**D. Retaliation**

Blalock also alleges that he was a victim of retaliation for his use of the grievance process. In order to bring a viable First Amendment retaliation claim under Section 1983, a plaintiff must prove the following elements: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks omitted). The Second Circuit has cautioned that courts should approach prisoners' claims of retaliation with "skepticism and particular care," *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), as "virtually any adverse action taken against a prisoner by a prison official — even those otherwise not rising to the level of a constitutional violation — can be characterized as a constitutionally proscribed retaliatory act," *Ortiz v. City of New York*, No. 12-CV-3118 (HB), 2012 WL 6200397, at *5 (S.D.N.Y. Dec. 12, 2012) (quoting *Smith v. City of New York*, No. 03-CV-7576 (NRB), 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005)). In order to avoid dismissal, therefore, claims "must be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Friedl v. City of New York*, 210 F.3d 79, 85-86 (2d Cir. 2000) (internal quotation marks omitted).

Applying those standards here, Blalock's claims that Defendants retaliated against him for his use of the grievance process fail as a matter of law. Blalock alleges that Defendants retaliated by selecting him for the drug test on May 30, 2012 (Compl. ¶ 82; Pl.'s Mem. 19-20);

11

and by fabricating a positive test result, which he attributes to O'Connor (Compl. ¶ 95; Pl.'s Mem. 21). With respect to the first allegation, however, Blalock has not established that any Defendant was personally involved in that decision, as he himself admits in his Complaint that he was chosen by random selection, a fact that is confirmed by the prison Request for Urinalysis and consequent Inmate Misbehavior Report that are attached to the Complaint. (Compl. ¶ 82; *id*. Ex. 11).[5] Blalock's second allegation also fails, as his assertion that O'Connor "*may* have had something to do with Blalock being falsely accused of using marijuana" (*Id*. ¶ 208 (emphasis added)) falls far short of the "specific and detailed factual allegations" necessary to support a plausible retaliation claim. *Friedl*, 210 F.3d at 85-86; *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("A complaint of retaliation that is wholly conclusory can be dismissed on the pleadings alone.") (internal quotation marks omitted). Thus, Blalock's retaliation claims are hereby dismissed.

**E. Religious Exercise**

Next, Blalock alleges that several Defendants violated his constitutional rights under the Free Exercise Clause of the First Amendment. In order to bring such a claim, Blalock "must show at the threshold that the disputed conduct substantially burdens his sincerely held beliefs." *Salahuddin*, 467 F.3d at 274.[6] Once a plaintiff makes such a showing, the defendants "bear the

---

[5] In attempting to call into doubt the fact that his selection for drug testing was random, Blalock alleges that the reasons for drug testing offenders "are very specific" and names several that could not have implicated him. (Pl.'s Mem. 20). But the mere fact that several categories of offender testing could *not* have included Blalock does not plausibly suggest that the one category of testing that *could* have included him, the random testing category, was not the true reason for testing Blalock.

[6] The Second Circuit recently noted that it has not ruled on whether the substantial burden test continues to be the relevant test, given that it "embroils courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.'" *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) (quoting *Ford v. McGinnis*, 352 F.3d 582, 592 (2d Cir. 2003)). As none of the parties here raises the issue, however, this Court will apply the test to Blalock's claims.

relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Id.* at 275. As with all Section 1983 claims, Blalock must also establish that each Defendant against whom he brings the claim was personally involved in any unconstitutional conduct. *See, e.g.*, *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013).

### 1. Denial of Religious Services

Blalock first alleges that his rights under the Free Exercise Clause were violated when he was twice unable to attend Muslim religious services while awaiting his disciplinary hearing at Green Haven. (Compl. ¶ 89). It is "well established that a prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock." *Ford*, 352 F.3d at 597. Courts in this Circuit, however, have held that the conduct Blalock challenges — the denial of two religious services — does not substantially burden an inmate's right to religious observation. *See, e.g.*, *Shapiro v. Cmty. First Servs., Inc.*, No. 11-CV-4061 (KAM), 2014 WL 1276479, at *11 (E.D.N.Y. Mar. 27, 2014) (ruling that missing two religious services is an insubstantial burden on an inmate's ability to freely exercise his religion); *Williams v. Weaver*, No. 03-CV-0912 (LEK), 2006 WL 2794417, at *5 (N.D.N.Y. Sept. 26, 2006) (same). Therefore, Blalock's claim in that regard is dismissed.

### 2. Pants-Length Claims

Blalock also alleges that Erns violated his right to freely exercise his religion by requiring him, on two occasions, to wear longer pants than allowed by Islamic law.[7] Insofar as preventing an inmate from attending only two religious services does not substantially burden that inmate's

---

[7] As noted earlier, Defendant Jacobsen — the author of the Directive 3081 Memorandum — has not moved to dismiss. As such, the Court need not consider Plaintiff's claims related to the pants-length policy itself.

13

right to free exercise, there is some reason to doubt whether denying Blalock the right to wear shorter pants on only two occasions can rise to the level of a constitutional violation. But the Court need not answer that question, because, even if it can, Erns is entitled to qualified immunity from Blalock's claim. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (making clear that a court may, in its own discretion, refrain from determining whether a constitutional right has been violated and instead move directly to the question of qualified immunity). Qualified immunity shields government officials from civil suits for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In order to be "clearly established," a right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Reichle v. Howards*, — U.S. —, 132 S. Ct. 2088, 2093 (2012) (brackets and internal quotation marks omitted). Further, the court's determination of whether the right at issue is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *DiStiso v. Cook*, 691 F.3d 226, 229 (2d Cir. 2012) (internal quotation marks omitted).

Applying those standards here, there is no question that Erns is entitled to qualified immunity with respect to Blalock's pants-length claim. For one thing, neither the Supreme Court nor the Second Circuit has ever ruled that a prisoner's right to free exercise encompasses the right to wear pants at any particular length. To be sure, the Second Circuit has ruled that "prison officials may not substantially burden inmates' right to religious exercise without some justification," *Salahuddin*, 467 F.3d at 275-76, but phrasing the right at that level of generality is contrary to the requirement that the right be "defined with reasonable specificity" in order to be clearly established, *Mollica v. Volker*, 229 F.3d 366, 371 (2d Cir. 2000) (internal quotation marks

14

omitted).  Second, and in any event, a reasonable officer in Erns' position would not have

understood his actions to be violating that law because, on both occasions, he acted in

accordance with official DOCCS policy (in the first instance, the original Directive 3081

Memorandum, and in the second, the amended version of Directive 3081, which allowed Muslim

inmates to wear altered pants, but only to the top of the ankle bone).  *See, e.g.*, *DiChiara v.*

*Wright*, No. 06-CV-6123 (KAM), 2011 WL 1303867, at *11 (E.D.N.Y. Mar. 31, 2011) (holding

that prison official defendants were entitled to qualified immunity when they "were relying upon

and applying" DOCCS policy).  It may well be that Blalock's pants were actually in compliance

with the amended Directive on the second occasion (Compl. ¶ 67), but Blalock himself admits

that the amended Directive was difficult to enforce correctly as his "pant hem appear[ed] to be

the correct height[] when standing still[,] but too short when walking or sitting."  (Pl.'s Mem.

10).  In light of those circumstances, a reasonable officer in Erns's position would not have

understood that what he was doing was against the law.

     Blalock's contrary claim — that Erns should not be entitled to qualified immunity despite

the existence of DOCCS policies that would entitle him to such a defense — appears to rest on

the contention that Erns harbored ill will towards Blalock.  Blalock indicates that Erns "began his

harassing and profiling long before [the Directive 3081 Memorandum]" (Pl.'s Mem. 5);

speculates that Erns had, in fact, seen the amended Directive 3081 when he claimed otherwise

(Pl.'s Mem. 8); and points to a minor variation between the amended Directive and Erns'

conduct — namely, that on February 13, 2012, he ordered Blalock back into his cell to change

into unaltered pants rather than sending Blalock to the state shop — as evidence that Erns'

conduct was unreasonable.  As the Supreme Court has made clear, however, the qualified

immunity defense "reli[es] on the *objective* reasonableness of an official's conduct."  *Harlow*,

457 U.S. at 818.  Accordingly, Erns' subjective motivations — whatever they may have been — do not affect the qualified immunity calculus.  *See, e.g.*, *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ("[A] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense."); *Rodriguez v. City of New York*, No. 97-CV-0217, 1999 WL 58911, at *4 (S.D.N.Y. Feb. 8, 1999) ("While some of the officers and detectives involved in Rodriguez's arrest may have had a retaliatory motive, subjective bad faith is not relevant to the qualified immunity defense.");  *Henry v. Dinelle*, 929 F. Supp. 2d 107, 122-23 (N.D.N.Y. 2013) (collecting cases), *aff'd*, 557 F. App'x 20 (2d Cir. 2014). Thus, Blalock's religious exercise claim against Erns must be dismissed.

### F. Personal Involvement

Finally, Blalock's claims against Lee, Burnett, and Prack must be dismissed for failure to allege their personal involvement in any alleged wrong.  *See Iqbal*, 556 U.S. at 676 (holding that, in order to establish personal involvement for purposes of a Section 1983 action, a plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution"); *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) ("Proof of an individual defendant's personal involvement in the alleged wrong is . . . a prerequisite to his liability on a claim for damages.").

First, Blalock alleges that Lee should be held liable for the pants-length policy — and officer conduct arising out of it — because he, like all DOCCS superintendents, received a copy of the initial policy (Compl. ¶ 41), was made aware of Blalock's concerns about the policy when Jacobsen responded to Blalock's December 30, 2011 letter and copied Lee (*id*. Ex. 4), and failed to take appropriate action in response to Blalock's complaint of staff misinterpretation of the

Directive, in that he merely referred the complaint to O'Connor and another lieutenant and failed to address Blalock's concerns about the "mishandling" of the complaint's investigation. (*Id.* ¶¶ 73-74, 76, 79-80; Pl.'s Mem. 27-29).  It is well established, however, that a prison official "cannot held be liable on the sole basis that he failed to respond to letters of protest." *Partee v. Grood*, No. 06-CV-15528 (SAS), 2007 WL 2164529, at *5 (S.D.N.Y. July 25, 2007) (internal quotations omitted), *aff'd sub nom. Partee v. Wright*, 335 F. App'x 85 (2d Cir. 2009).  Additionally, it cannot be said that Lee was personally involved insofar as he referred Blalock's complaint to his subordinates, because "if a supervisor merely received information of unconstitutional acts but reasonably acted upon it such as by forwarding a complaint to a subordinate for investigation and response, that does not establish personal involvement." *Eldridge v. Williams*, No. 10-CV-0423 (LTS), 2013 WL 4005499, at *5 (S.D.N.Y. July 30, 2013); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 2007) (holding that a supervisor's referral of a complaint to another official was insufficient to establish personal involvement).

Blalock also fails to establish personal involvement on the part of Burnett.  As Blalock's claims based on verbal harassment and the denial of religious services have been dismissed, the only surviving claim against Burnett is based on his January 18, 2012 denial of Blalock's grievance challenging the Directive 3081 Memorandum, in which Defendant Burnett instructed Blalock to instead file a complaint with the Inmate Liaison Committee.  (Compl. Ex. 3).  But as courts have long held, the denial of an inmate's grievance is insufficient to establish personal involvement in a Section 1983 action.  *See, e.g.*, *Foreman v. Goord*, No. 02-CV-7089 (SAS), 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) (holding that a superintendent's denial of an inmate's grievance is insufficient to establish personal involvement); *Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) (same).  That is particularly true where, as here, the denial

took the form of referring Plaintiff to another authority. *See, e.g.*, *Sealey*, 116 F.3d at 51. Accordingly, Blalock's claim against Burnett must be dismissed.

Although Blalock's claim against Prack is different — it rests not on the denial of a grievance, but rather on Prack's review and affirmation of an allegedly unconstitutional hearing despite having the power to vacate the results — the outcome is the same. (Compl. Ex. 23). To be sure, there is some authority for the proposition that, where a defendant is in a position to remedy an "ongoing" constitutional violation but fails to do so, he or she can be held liable under Section 1983. *See, e.g.*, *Delgado v. Bezio*, No. 09-CV-6899 (LTS), 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) (finding defendants' personal involvement because they were "alleged to have had the power, and to have refused, to vacate a penalty they knew had been imposed in violation of plaintiff's due process rights"); *Thomas v. Calero*, 824 F. Supp. 2d 488, 509 (S.D.N.Y. 2011) (ruling that a defendant was personally involved in a due process violation by affirming a disciplinary hearing's results with only a modification of the penalty). In this case, however, the Court need not decide whether that authority is sound, as there was no "ongoing" violation to be remedied: Prack affirmed the results of Blalock's disciplinary hearing on August 30, 2012, the very same day that Blalock was released from the SHU. (Compl. ¶ 118; *id*. Ex. 23). Thus, Blalock's claim against Prack must be and is dismissed.

## CONCLUSION

For the foregoing reasons, the Moving Defendants' motion to dismiss is GRANTED in all respects except as to Blalock's due process claim against Huttle.

The Clerk of the Court is directed to terminate Prack, Lee, Burnett, Bucolo, O'Connor, Erns, Goehl, and Mills as Defendants in this action. The Clerk of the Court is further directed to

terminate Defendants' motion to dismiss (Docket No. 24) and to mail a copy of this Opinion and Order to Blalock.

    SO ORDERED.

Date:  October 20, 2014
         New York, New York

                                            JESSE M. FURMAN
                                            United States District Judge